## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| TONIA MILLER, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| DETECTIVE TIM HURTT, | ) | Judge |
| ROBERT PECK, RUSSELL BELL, | ) | |
| ROBERT BECK, BRIAN HUNTER, | ) | Magistrate |
| and the CITY OF BATTLE CREEK, | ) | |
| a municipal corporation, and the | ) | |
| COUNTY OF KALAMAZOO, | ) | |
| MICHIGAN, a municipal corporation, | ) | |
| all jointly and severally, | ) | |
| | ) | **JURY DEMAND** |
| Defendants. | ) | |

## COMPLAINT

**NOW COMES** the Plaintiff, TONIA MILLER, by and through her attorneys, Erickson & Oppenheimer, complaining against the Defendants, TIM HURTT, ROBERT PECK, RUSSELL BELL, ROBERT BECK, and BRIAN HUNTER, individually, and the CITY OF BATTLE CREEK, MICHIGAN, a municipal corporation, and the COUNTY OF KALAMAZOO, MICHIGAN, a municipal corporation, as follows:

## **INTRODUCTION**

1)      Tonia Miller's daughter, A.D., was constantly unwell throughout her 11-week life. A.D. had trouble keeping her formula down and vomited frequently. There were a number of times where she spontaneously stopped breathing, sometimes for as long as 45 seconds. Ms. Miller was concerned about her daughter and repeatedly tried to get help from doctors at Northside Pediatrics. Unfortunately, these visits failed to result in a tenable explanation, and A.D.'s medical issues, including acute pneumonia, continued until her death.

2)      Despite this history of illness, the Medical Examiner, Dr. Brian Hunter, incorrectly determined that A.D.'s death was not caused by her medical issues. He noted that she had subdural bleeding, brain swelling, and retinal hemorrhaging and concluded that she had been shaken to death. Due to this diagnosis of Shaken Baby Syndrome (SBS), the police department began searching for a perpetrator. After six months they turned their attention to Tonia Miller, who was not initially a suspect.

3)      Both Dr. Hunter and Dr. Robert Beck ignored the open and obvious cause of death from pneumonia in favor of the criminal charge of child abuse despite the clear indications available from the medical history, Tonia Miller's statements, and the medical evidence of lung damage and other complications that pointed toward natural causes for the death of A.D.

4)      Ms. Miller was taken into police custody for questioning. After being prompted with an explanation by the detective about SBS, Ms. Miller explained that she shook A.D. in an attempt to revive her after she had stopped breathing. Ms. Miller never admitted that she shook A.D. before she stopped breathing. Ms. Miller was coerced into giving a fabricated statement based on the fabricated evidence created by Defendants.

## JURISDICTION

5)      The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. §§ 1983 and 1985; the Judicial Code 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States; and pendent jurisdiction as provided under U.S.C. § 1367(a).

## VENUE

6)      Venue is proper under 28 U.S.C. Section 1391 (b). All of the parties reside in this judicial district and the events described herein all occurred within this district.

## THE PARTIES

7)      The Plaintiff, Tonia Miller, was an 18 year old mother of two girls, A.D. and K.M. who was wrongfully convicted and maliciously prosecuted in the present case. Ms. Miller currently resides in Battle Creek, Michigan, where she also lived prior to her wrongful conviction.

8)     A.D. was Tonia's Millers eleven week old daughter who she was falsely convicted of murdering.

9)     K.M. was Tonia Miller's two year old daughter who was removed from her mother's care as a result of this wrongful conviction and who has also suffered the loss of her sister and the care and contact with her mother due to Plaintiff's wrongful conviction.

10)    Alan Duff was the father of A.D.

11)    Detective Tim Hurtt was a sworn officer acting under the color of law and within the scope of his employment at all times in this case and coordinated the conspiracy to convict Tonia Miller through the evidence fabricated by the other Defendants and his own individual actions. Detective Hurtt is a current or former officer and employee of the Battle Creek Police Department and the City of Battle Creek.

12)    Robert Peck was a worker from the Family Independence Agency of the Kalamazoo County Children's Protective Services who received direction from Defendant Hurtt to interview Tonia Miller without a lawyer present or with any constitutional protections and was acting under the color of law at all times in this case and coordinated the conspiracy to convict Tonia Miller through the evidence fabricated by the other Defendants and his own individual actions. Robert Peck is a current or former employee of the County of Kalamazoo, Michigan.

13)    Russell Bell was a worker from the Family Independence Agency of the Kalamazoo County Children's Protective Services who received direction from Defendant Hurtt is interview Tonia Miller without a lawyer present or with any constitutional protection and was acting under the color of law at all times in this case and coordinated the conspiracy to convict Tonia Miller through the evidence fabricated by the other Defendants and his own individual actions. Russell Bell is a current or former employee of the County of Kalamazoo, Michigan.

14)    Doctor Robert Beck was a pediatric intensivist at Bronson Medical Center. At all times relevant to this action, Dr. Robert Beck was a state actor insofar as he engaged with Defendants Hurtt, Peck, Bell and Hunter in conducting the investigation that led to Plaintiff's wrongful conviction, conspired with the Defendants to secure Plaintiff's wrongful conviction, and was serving a public function and/or was given the authority by the Defendant Officer to identify a perpetrator of the murder for which Plaintiff was wrongfully convicted.

15)    Doctor Brian Hunter was the forensic pathologist at Sparrow Hospital who provided autopsy services on behalf of the Kalamazoo County Medical Examiner's Office. At all times relevant to this action, Dr. Brian Hunter was a state actor insofar as he engaged with Defendants Hurtt, Peck, Bell and Beck in conducting the investigation that led to Plaintiff's wrongful conviction, conspired with the Defendants to secure Plaintiff's wrongful conviction, and was serving a

public function and/or was given the authority by the Defendant Officer to identify a perpetrator of the murder for which Plaintiff was wrongfully convicted.

16)    The City of Battle Creek is a Michigan municipal corporation authorized as such by the laws of the State of Michigan, that operates a police department as a part of its responsibilities and services. By and through its agents, including but not limited to the Chief of Police, its supervisors, operating officers, Boards, Commissions, and Committees and its final policymakers, Defendant City of Battle Creek, at all times relevant hereto, established, promulgated and implemented the policies, written and unwritten, of the Battle Creek Police Department, with regard to hiring, training, supervision, and discipline of the employees of said department, including but not limited to Detective Tim Hurtt.

17)    Kalamazoo County is a Michigan municipal corporation authorized as such by the laws of the State of Michigan, that operates a Medical Examiner's Office as a part of its responsibilities and services. By and through its agents, including but not limited to the Department of Public Health, its supervisors, operating agents, Boards, Commissions, and Committees and its final policymakers, Defendant Kalamazoo County, at all times relevant hereto, established, promulgated and implemented the policies, written and unwritten, of the Kalamazoo county Medical Examiner's Office, with regard to hiring, training, supervision, and discipline of the

employees and/or contractors of said department, including but not limited to Dr. Hunter.

## BACKGROUND

### A.D.'s health problems, emergency hospitalization, and death

18)     A.D. was born on July 29, 2001, to 18-year-old Tonia Miller. A.D. was sick throughout the entirety of her short life. Soon after birth, it was noted that she had "poor suck/swallow coordination" and that she regurgitated formula from her nose. As time went on, Ms. Miller became concerned by how much A.D. was vomiting and wanted to ensure her baby was getting the nourishment she needed. She repeatedly took A.D. to doctors at Northside Pediatrics.

19)     A.D.'s appetite improved after her pediatrician suggested putting cereal in the formula, but the constant vomiting continued. Just a few weeks after changing A.D.'s diet, Ms. Miller again brought A.D. to see a doctor after several apneic episodes where A.D. had suddenly stopped breathing. A.D. would always "come back around" after 30-45 seconds of not breathing, but Ms. Miller was concerned and requested a heart monitor.

20)     The apneic episodes continued. Once, when A.D. was about seven weeks old, she stopped breathing while at the home of one of Ms. Miller's friends. Ms. Miller testified that she was able to resuscitate her daughter as she had before and once again rushed her to the doctor where she again inquired about a heart

monitor. She testified that she was told a heart monitor was not necessary and that A.D.'s vitals were fine.

21)    Despite the pediatrician's assurances, A.D. continued to have difficulty breathing, including an episode where A.D. stopped breathing while Ms. Miller was on the phone with the pediatrician's office scheduling A.D.'s two-month exam. Ms. Miller testified that she rushed A.D. to the doctor, but once again felt that her concerns were not being taken seriously. Ms. Miller would call her mother, Theresa Miller, while crying to tell her that the pediatricians had dismissed her as "a paranoid parent."

22)    Several family members witnessed A.D. stop breathing, but their observations were not presented at trial because they were irrelevant to the defense theory that A.D. died from SBS inflicted by someone other than Ms. Miller. When A.D. was about a month old, she was at a block party with her grandmother, Theresa Miller, when she had what appeared to be a seizure A.D.'s body stiffened, her back arched, and her eyes rolled back into her head. Theresa Miller called for Ms. Miller, who took A.D. into the house and was able to return her to normal. Ms. Miller's brother, Curtis Miller, witnessed similar episodes.  At some point after the block party, Ms. Miller brought A.D. to her mother's house. While Ms. Miller was off in another room, her younger sister, Charlene Mae Peterson, heard A.D.'s breath becoming increasingly labored, as if "she was breathing water in and out, almost as

if she was drowning in fluid. Ms. Peterson called out for Ms. Miller, who came running to check on A.D. Ms. Miller told Ms. Peterson that she had also noticed A.D. had been having trouble breathing.

23)     People outside of the immediate family also witnessed A.D.'s episodes. One evening shortly before A.D. died, Ms. Miller was visiting Dennis and Anna Edwards when A.D. stopped breathing yet again. Mr. Edwards had to blow into A.D.'s face to get her breathing again.

24)     Carla Edwards, Mrs. Edwards' daughter, regularly accompanied Ms. Miller to A.D.'s doctor's appointments and felt that Ms. Miller was never taken seriously due to her age. Ms. Miller expressed similar feelings to Mrs. Edwards, saying that she felt like the doctor did not listen to her.

25)     On two other occasions, a neighbor of Ms. Miller's witnessed A.D. have what she called "seizures." During those episodes, A.D.'s eyes would roll back into her head, and she appeared to stop breathing. Mrs. Wesner's daughter was afraid to hold A.D. after witnessing her stop breathing a couple of times. Each time an episode happened, A.D. would begin making a rasping sound and then her eyes would roll back, and her head would snap backwards. Whitney handed A.D. back to Ms. Miller each time this happened. Ms. Miller then tended to A.D. until she made a gasping sound and began to breathe normally again.

26)     Ms. Miller testified that A.D. had one final apneic episode on October 19, 2001. She witnessed A.D. gasp for air and then stop breathing altogether. Ms. Miller picked her up and saw that one of her eyes had rolled to the side. Her back arched suddenly, and Ms. Miller straightened her out so she could set her on the floor.[1] At 9:09 a.m., Ms. Miller called 911 and emergency responders soon arrived at 9:13 a.m. They found A.D. unresponsive and motionless on the floor, but she then coughed and vomited formula out of her nose and mouth. They carried her to the ambulance and departed from Ms. Miller's home at 9:19 a.m. There was an attempt to intubate A.D. at 9:22 a.m., but this failed because there was too much vomit. A.D. arrived at Battle Creek Health Systems (BCHS) at 9:25 a.m. wearing a facemask that had been placed over her face in an attempt to help her breathe.

27)     A blood draw was taken shortly after A.D.'s arrival. Results demonstrated the presence of staphylococcus hominis, bacteria that can cause severe and fatal pneumonia in infants.

28)     There were two more attempts to intubate A.D. at 9:40 and 9:45 a.m., with the latter attempt succeeding. At 11:30 a.m., A.D. was transported from BCHS to the Pediatric Intensive Care Unit at Bronson Hospital, where she arrived at 12:23 p.m. A CT scan was immediately ordered by Dr. Glen D. Libby. The CT scan

---

[1] Ms. Miller reported this same account to hospital personnel at Battle Creek Health Systems.

revealed the presence of subdural and subarachnoid blood as well as a possible mild brain edema (brain swelling). Dr. Libby first discussed the likelihood of a diagnosis of Abusive Head Trauma (AHT) with the family at 3 p.m., at which point Ms. Miller denied that abuse could be a possibility.

29)    A subsequent ophthalmological examination by Dr. Roe found retinal hemorrhaging believed to be consistent with SBS. At that time, the only differential diagnoses proposed for the ophthalmological findings was coagulopathy or leukemia. Dr. Patricia Sorek conducted a bone survey at 7:37 p.m. on October 19, 2001 and found no evidence of bone fractures.

30)    Dr. Robert Beck examined A.D. that same evening and noticed no bruising or abnormalities on A.D.'s limbs.

31)    A second CT scan conducted the next morning, October 20, 2001, at 9:40 a.m. showed that the brain edema had increased in size. Brain death protocol was initiated at 12:04 p.m. A.D. died in her parents' arms at 7:27 p.m. on October 20, 2001.

### Death investigation

32)    Two days later, Dr. Brian Hunter conducted an autopsy of A.D., which Detective Tim Hurtt attended.

33)    Dr. Hunter listed A.D.'s manner of death as "homicide." In the same paragraph, Dr. Hunter wrote that "the . . . findings in this case strongly indicate that

shaking is the mechanism that caused these injuries[.]" The first three findings he listed in the autopsy report were the components of the triad: subdural hemorrhaging, retinal hemorrhaging, and cerebral edema (brain swelling). While he did not rule out blunt-force trauma, he noted that "there are no scalp bruises or skull fractures to indicate points of impact." He noted the presence of a subdural membrane (meaning an older, healing injury), but believed it "[did] not explain the fresh subdural blood and cannot be considered its source." He went on to say that "[a] subdural hemorrhage associated with birth cannot be ruled out."

34)     While SBS was a common diagnosis in the medical community at this time based on the triad of symptoms, it was also clear in the medical community that acute pneumonia could cause the same symptoms.

35)     Dr. Hunter's autopsy notes "acute bronchopneumonia and congestion," however, he deliberately omitted information that would have pointed toward pneumonia as the cause of death, to wit:

   a. A.D.'s significant history of apneic episodes that were documented in her medical records;

   b. the positive result for staphylococcus hominis from A.D.'s blood culture at BCSH the day before her death;

   c. a chest x-ray at Bronson Hospital showed bilateral lung opacities the day before her death; and

    d. the autopsy report's respiratory system review was incomplete and wildly inaccurate, omitting any description or reference to the obvious sections of interstitial and necrotizing pneumonia that are visible in the lung slides.

36) Dr. Hunter and Detective Hurtt discussed and decided to deliberately downplay A.D.'s obvious pneumonia and wrongfully conclude instead that there was "overwhelming evidence . . . that this child had been shaken beyond normal and that the shaking undoubtedly caused the child's death[.]"

37) Based on this deceptive conclusion, Detective Hurtt arranged to arrest Ms. Miller.

## Trial and conviction

38) At trial, the prosecution called two expert witnesses: Dr. Robert Beck, a pediatrician, and Dr. Brian Hunter, a forensic pathologist.

39) Dr. Beck testified for the prosecution about his findings during his examination of A.D. and his subsequent review of her medical records. He maintained that A.D.'s death was the result of SBS. Dr. Beck explained how "shaking the child back and forth" can cause the brain to rapidly accelerate and decelerate, "impacting the inside of the skull at each time it stops." He went on to describe how this rapid motion, coupled with the layered structure of the brain, can result in shearing injuries as the layers of the brain move over one another. He stated

that this rapid motion can also cause retinal hemorrhaging. Based on his discovery of the retinal hemorrhaging, A.D. underwent a CT scan that revealed subarachnoid and subdural bleeding. According to Dr. Beck's, the combination of these "triad" symptoms met the diagnostic criteria for SBS or AHT. In his words, "[t]here's really no other explanation typically found."

40)     With the assistance of a small doll, the prosecutor then demonstrated "how severely" one would have to shake a baby to cause the type of injuries A.D. sustained, ultimately acting out three violent shaking episodes of escalating intensity until Dr. Beck approved. Dr. Beck noted only two cases where similar injuries were found to have been caused accidentally. Both involved high-speed rollover accidents where the children presented with long bone and skull fractures.

41)     Dr. Beck acknowledged that some of A.D.'s symptoms (expelling milk from her nostrils) could be caused by pneumonia, but contrary to the medical records, he falsely testified that A.D. did not have pneumonia.

42)     Dr. Brian Hunter shared his findings following his autopsy of A.D. on October 22, 2001. Based on the existence of the "triad," he also believed the cause of death to be abusive head injuries.

43)     Dr. Hunter began by giving an in-depth description of the mechanics of abusive head trauma, noting that it can be caused by either shaking or a blunt-force head injury. He identified retinal hemorrhaging, cerebral edema, and subdural

bleeding as indicative of abusive head trauma. He went on to note that A.D. presented with all three symptoms. ("Extensive retinal hemorrhage[.]"); ("[the bulging of the brain] indicates severe cerebral swelling or cerebral [e]dema"), ("[T]his is subdural blood.").

44)    Dr. Hunter consulted with two neuropathologists. The first neuropathologist he consulted with found "anoxic" or "hypoxic" changes in the brain, evidence that the brain had been deprived of oxygen. Dr. Hunter believed this lack of oxygen had been caused by the swelling of the brain. This first neuropathologist also noted the presence of macrophages (cells involved in the healing process) which "suggested that there was some injury prior to this final episode." This neuropathologist postulated that there was a previous injury one week earlier, but Dr. Hunter believed this to be an "overstatement." Dr. Hunter acknowledged that "you can get focal subdural hemorrhages" during birth and that macrophages from such an event "certainly could still be there two months later[.]" Dr. Hunter consulted with another neuropathologist, who agreed with Dr. Hunter that the first neuropathologist's diagnosis of a prior head injury was an "overstatement." He concluded that all of the injuries he observed in A.D.'s case were "fresh."

45)    Given the existence of the "triad" of symptoms (retinal hemorrhaging, brain swelling, and subdural hemorrhaging), Dr. Hunter concluded that the cause of A.D.'s death was an abusive head injury and the manner of death was homicide.

46)    At trial, defense counsel did not contest the "shaking hypothesis." In defense counsel's opening statement, he stated that "[t]he evidence has shown that the baby died and it was the result of abuse. The question the evidence left is who did it?" In his closing argument, he again conceded that "the baby was hurt. Someone did something." His theory of defense turned on expanding the window of time during which A.D. could have been injured, thus presenting the jury with the possibility that someone other than Ms. Miller could have shaken A.D.

47)    Ms. Miller's defense counsel offered no evidence challenging the validity of Shaken Baby Syndrome, nor did he present any alternative explanation for what caused A.D.'s death. Instead, to support his theory that someone else could have had the opportunity to injure A.D., he relied on the testimony of Dr. Dragovic, whose findings indicated that A.D. had been injured approximately one week before – rather than immediately prior to – her death.

48)    At trial, Ms. Miller denied forcefully or abusively shaking A.D. Ms. Miller described how she reacted after realizing that A.D. had stopped breathing, at which point Ms. Miller "shook her just enough to where she straightened her back out" so she could lay A.D. on the floor. When asked if she shook A.D. hard, Ms. Miller answered "no, I did not."

49)    Instead, Ms. Miller testified that she gently prodded A.D. to revive her after she had ceased breathing and one of her eyes had rolled to the side. Robert

Peck, an employee of the Kalamazoo County Family Independent Agency who testified for the prosecution, also testified that Ms. Miller told him she shook A.D. "after milk poured out of the child's nose."

50)   The jury was left with only one possible cause of death: SBS/AHT. On April 14, 2003, the jury found Ms. Miller guilty of murder in the second degree. On May 19, 2003, Ms. Miller was sentenced to 20-30 years imprisonment.

### Appellate and post-conviction history

51)   Ms. Miller's appellate counsel raised three issues on appeal: 1) that her conviction was against the greater weight of the evidence; 2) that Dr. Hunter relied on the report of non-witness independent neuropathologists in violation of her Sixth Amendment right to confrontation and her Fifth and Fourteenth Amendment rights of due process; and 3) that her due process rights were violated when Dr. Hunter's testimony was improperly admitted due to the fact that he based his findings on the neuropathologists' reports without laying a proper foundation for them. The Appellate Court affirmed Ms. Miller's conviction in an unpublished per curiam opinion on November 9, 2004.

### New expert reports on A.D.'s case

52)   Nearly 15 years after Ms. Miller was convicted, the Michigan Innocence Clinic agreed to represent Ms. Miller and contacted four experts to analyze the medical records, scientific evidence, autopsy findings, and expert

testimony presented at trial: (1) Dr. Francis H.Y. Green, M.D., a lung pathologist, (2) Dr. Janice Ophoven, M.D., a pediatric forensic pathologist, (3) Dr. Roland Auer, M.D., a neuropathologist, and (4) Dr. Julie A. Mack, M.D., a radiologist.

53)     Each of the retained experts in this case, after conducting independent medical reviews, concluded that there is no evidence that abuse—let alone shaking—caused A.D.'s death. According to the experts, the evidence clearly shows that these injuries (the "triad") are not diagnostic of abuse, making it necessary to look at competing diagnoses for A.D.'s death. According to the new experts, A.D. did not die from abuse, but rather a combination of pneumonia and other natural causes that caused a lack of oxygen in her brain.

54)     The combination of pneumonia and other natural causes was open and obvious at the time that the Defendants conspired to fabricate evidence and sustain the wrongful conviction of Tonia Miller.

## **Plaintiff's Damages**

55)     As a direct result of the Defendant's misconduct, Plaintiff suffered numerous injuries, including but not limited to loss of liberty, loss of wages, attorneys' fees expended in defense of her wrongful prosecution and efforts to prove her innocence, physical injuries, reputational harm and emotional trauma.

56)     Prior to her wrongful incarceration, Plaintiff lived with her daughter, K.M. and her Alan Duff and was pursuing educational and employment opportunities.

57)     The emotional pain and suffering caused by losing almost two decades of her life has been substantial. The case was publicized, and neighbors in her community learned that she was charged with child abuse. She faced stigma, and experienced fear and distress during her nearly decade-long detention. She continues to suffer from daily feelings of nervousness, fear, distress, and worry about the future.

58)     Plaintiff's suffering was compounded because she was separated from her remaining child (K.M.), who grew up largely without a mother, a fact that has caused, and continues to cause Plaintiff incalculable pain.

59)     Moreover, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. Plaintiff was taken from her family, losing the opportunity to watch, guide, and support her child through her childhood, adolescence, and young adulthood. She missed the ability to share holidays, birthdays, weddings, and other life events with her loved ones. Finally, Plaintiff must now attempt to make a life for herself outside of prison without the benefit of almost two decades of life or work experiences.

## COUNT I

## 42 U.S.C. § 1983 –Due Process

60)    Plaintiff incorporates each and every paragraph of this Complaint as if fully restated here.

61)    In the manner described more fully above, Defendants Hurtt, Peck, Bell, Beck, and Hunter (together "Individual Defendants"), while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of her constitutional right to a fair trial.

62)    In the manner described more fully above, the Individual Defendants deliberately withheld exculpatory evidence, as well as fabricated false reports and other evidence, thereby misleading and misdirecting the criminal prosecution. Absent the totality of this misconduct, the prosecution of Plaintiff could not and would not have been pursued and her conviction would not have resulted.

63)    As a result of the misconduct described in this Count, Plaintiff suffered injuries, including but not limited to personal physical injury and emotional distress, as more fully alleged above.

## COUNT II

## 42 U.S.C. § 1983—Federal Malicious Prosecution

64)    Plaintiff incorporates each and every paragraph of this Complaint as if fully restated here.

65)    In the manner described more fully above, the Individual Defendants, individually, jointly and conspiracy with one another, as well as under color of law and within the scope of their employment, initiated and perpetuated a criminal proceeding against Plaintiff that lacked probable cause and in spite of the fact that they knew Plaintiff was innocent.

66)    In doing so, Individual Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived her liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

67)    The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

68)    Plaintiff's criminal prosecutions were terminated in her favor, in a manner indicative of innocence.

69)    Defendants deprived Plaintiff of a fair state criminal proceedings, including the chance to defend herself during those proceedings, resulting in the deprivation of liberty.

## COUNT III

## 42 U.S.C. § 1983—Conspiracy to Deprive Constitutional Rights

70)     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

71)     In the manner described more fully above, the Individual Defendants, reached an agreement among themselves, and other unknown co-conspirators, to prosecute Plaintiff for the death of A.D., regardless of her guilt or innocence, and thereby to deprive Plaintiff of her constitutional rights.

72)     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

73)     In furtherance of their conspiracy, each of the Individual Defendants committed overt acts and were otherwise willful participants in joint activity.

74)     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

75)     As a result of the misconduct described in this Count, Plaintiff suffered injuries, including but not limited to personal physical injury and emotional distress, as more fully alleged above.

## COUNT IV

## 42 U.S.C. § 1983 –Failure to Intervene

76)    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

77)    In the manner described more fully above, during the constitutional violations described herein, one or more of the Individual Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

78)    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

79)    As a result of the misconduct described in this Count, Plaintiff suffered injuries, including but not limited to personal physical injury and emotional distress, as more fully alleged above.

## COUNT V

## State Law Claim – Indemnification Pursuant to Michigan Statute 691.1408

## City of Battle Creek

80)    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

81)    Michigan statute (691.1408) provides that public entities are able to pay any tort judgment for compensatory damages for which employees are liable for negligent conduct within the scope of their employment activities.

82)    Defendant Hurtt was an employee, member, and agent of the City of Battle Creek, acting at all relevant times within the scope of his employment in committing the misconduct described herein.

83)    The City of Battle Creek indemnifies Detective Hurtt to pay any judgment entered against the Defendant. Plaintiff therefore demands judgment against Defendant City of Battle Creek, in the amounts awarded to Plaintiff against Defendant Hurtt as damages, attorneys' fees, costs and interest.

## COUNT VI

## State Law Claim –Indemnification Pursuant to Michigan Statute 691.1408

## County of Kalamazoo

84)    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

85)    Michigan statute (691.1408) provides that public entities are able to pay any tort judgment for compensatory damages for which employees are liable for negligent conduct within the scope of their employment activities.

86)    Defendants Peck and Bell were an employees, members, and agents of the County of Kalamazoo, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

87)    The County of Kalamazoo indemnifies Defendants Peck and Bell to pay any judgment entered against the Defendants. Plaintiff therefore demands judgment against Defendant Couty of Kalamazoo, in the amounts awarded to Plaintiff against Defendants Peck and Bell as damages, attorneys' fees, costs and interest.

## COUNT VII

### Monell Claim—City of Battle Creek

88)    Plaintiff hereby incorporates all previous paragraphs as though fully set forth herein.

89)    The Battle Creek Police Department is a subsidiary of the City of Battle Creek. The City maintains and exercises exclusive control over the Department, its policies and procedures, as well as the conduct of all of its employees, including Defendant Hurtt, and his supervisors.

90)    Defendant City of Battle Creek, through its subsidiary the Battle Creek Police Department, has established certain *de facto* policies, practices, and/or customs which were adopted and promulgated through the actions and inactions of

senior and intermediate supervising officers of the Battle Creek Police Department, and were thereby ratified by the City.

91)    The actions of the Defendant officers were done pursuant to one or more of the following *de facto* policies, practices and/or customs of the City that are so pervasive, that they carry the force and effect of law.

92)    At the time of this occurrence and prior thereto, there existed within the Battle Creek Police Department *de facto* policies, practices and/or customs which result in the failure or refusal of the Battle Creek Police Department to properly and legitimately investigate the adequacy and underlying verity of cases involving the death or injury of an infant and the allegations of child abuse.

## COUNT VIII

### Monell Claim—County of Kalamazoo

93)    Plaintiff hereby incorporates all previous paragraphs as though fully set forth herein.

94)    The Family Independence Agency of the Kalamazoo County Children's Protective Services is a subsidiary of the County of Kalamazoo. The City maintains and exercises exclusive control over the Department, its policies and procedures, as well as the conduct of all of its employees, including Defendant Hurtt, and his supervisors.

95)    Defendant County of Kalamazoo, through its subsidiary the Family Independence Agency of the Kalamazoo County Children's Protective Services, has established certain *de facto* policies, practices, and/or customs which were adopted and promulgated through the actions and inactions of senior and intermediate supervising members of the Family Independence Agency of the Kalamazoo County Children's Protective Services, and were thereby ratified by the County.

96)    The actions of the Defendant workers were done pursuant to one or more of the following *de facto* policies, practices and/or customs of the County that are so pervasive, that they carry the force and effect of law.

97)    At the time of this occurrence and prior thereto, there existed within the Family Independence Agency of the Kalamazoo County Children's Protective Services *de facto* policies, practices and/or customs which result in the failure or refusal of the Family Independence Agency of the Kalamazoo County Children's Protective Services to properly and legitimately investigate the adequacy and underlying verity of cases involving the death or injury of an infant and the allegations of child abuse.

WHEREFORE, Plaintiff Tonia Miller, respectfully requests that this Honorable Court enter a judgment in her favor and against Defendants Hurtt, Peck, Bell, Beck, Hunter, and the municipal corporations of the City of Battle Creek and the County

of Kalamazoo, awarding compensatory damages, attorneys' fees and costs against each Defendant, and because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

The Plaintiff requests a trial by jury.

## NOTICE OF ASSIGNMENT

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

Respectfully submitted,

/s/ Michael Oppenheimer

Erickson & Oppenheimer, Ltd.
223 W. Jackson, Suite 612
Chicago, IL 60606
312-327-3370