UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TONIA MILLER,

          Plaintiff,

v.

DETECTIVE TIM HURTT, ROBERT PECK,
RUSSELL BELL, BRIAN HUNTER and the
CITY OF BATTLE CREEK, a municipal
Corporation, and the COUNTY OF
KALAMAZOO MICHIGAN, a municipal
Corporation, all jointly and severally,

          Defendants.

File No. 1:24-cv-00279-JMB-SJB

HON. JANE M. BECKERING

MAG. SALLY J. BERENS

**Jon Neuleib**
Erickson & Oppenheimer LTD
Attorney for Plaintiff
223 W. Jackson Blvd., Ste. 612
Chicago, IL 60606
(312)327-3370
jonn@eolawus.com

**William Kim (P76411)**
**C. Marcel Stoetzel III (P61912)**
**Ian D. Wright (P61839)**
Attorneys for Defendants
City of Battle Creek and Tim Hurtt
10 N. Division St., Ste. 207
Battle Creek, MI 49014
(269)966-3385
cmstoetzel@battlecreekmi.gov
idwright@battlecreekmi.gov
wykim@battlecreekmi.gov

 **Allen C. Vander Laan (P33893)**
**Kristen L. Rewa (P73043)**
Cummings, McClorey, Davis & Acho
Attorneys for Defendant County of Kalamazoo
2851 Charlevoix Dr. SE. Ste. 203
Grand Rapids, MI 49546
(616)975-7470
avanderlaan@cmda-law.com
krewa@cmda-law.com

**Robert M. Wyngaarden (P35604)**
**Michael L. Van Erp (P44218)**
Wyngaarden Law, P.C.
Attorneys for Defendant Brian Hunter
3445 Woods Edge Drive
Okemos, Michigan 48864
(517)349-3200
rmw@wynlawpc.com
mlv@wynlawpc.com

**Terracina B. Echols (P81598)**
**Melissa L. Bianchi (P87474)**
Michigan Dep't of Attorney
General Health, Education &
Family Services Division
Attorneys for Defendants
Robert Peck and Russell Bell
3030 W. Grand Blvd., Ste. 10-200
Detroit, MI 48202
(313)456-0280
Echolst1@michigan.gov
Bianchim3@michigan.gov

**BRIEF IN SUPPORT OF
RULE 12(B)(6) MOTION FOR JUDGMENT ON THE PLEADINGS
BY DEFENDANT BRIAN HUNTER**

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES........................................................................... iv

1.  Introduction...........................................................................................1

2.  Standard of Review...............................................................................1

3.  Plaintiff's Allegations as Pled.............................................................3

4.  Plaintiff's Claims are Barred by the Applicable Statute of Limitations ............5

5.  Plaintiff's Claims Sound in Negligence...............................................6

    a.  Plaintiff's Complaint Includes Both Factual and Conclusory
        Allegations ...................................................................................6

    b.  The Factual Allegations in Plaintiff's Complaint Support, at Best, a
        Claim of Negligence ...................................................................7

6.  Allegations of Negligence Fail to State a Viable 1983 Claim of Violation of
    Constitutional Rights as Qualified Immunity Applies......................................8

    a.  The Case Law on Qualified Immunity Generally..................................8

    b.  The Case Law Specific to Fabrication of Evidence............................10

7.  The Doctrine of Judicial Estoppel Bars Plaintiff from Alleging Any Theory
    Other Than Negligence ...................................................................16

    a.  Judicial Estoppel Bars a Party from Asserting a Position which
        Contradicts a Position Successfully Taken in a Prior Proceeding .......17

    b.  Plaintiff Successfully Asserted in a Prior Proceeding that Newly
        Discovered Evidence Established that Dr. Hunter Acted Negligently in
        Following the Then Prevailing Medical Understanding of Abusive
        Head Trauma...............................................................................19

8.  Testimony Given During a Court Proceeding is Subject to
    Absolute Immunity ..........................................................................23

9.  Count I, Due Process, Fails to State a Viable Claim......................................24

10. Count II, Malicious Prosecution, Fails to State a Viable Claim ......................25

11. Count III, Conspiracy to Deprive Constitutional Rights, Fails to State a Viable Claim.................................................................25

12. Count IV, Failure to Intervene, Fails to State a Viable Claim ........................27

CONCLUSION.........................................................................................................28

# INDEX OF AUTHORITIES

*Ahlers v. Schebil*, 188 F.3d 365, 372-373 (6th Cir. Mich. 1999) ................................10

*Ashcroft v. Iqbal*, 556 U.S. 662, 668, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ....... 2-3

*Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545 (6th Cir.2007) ....2

*Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011)  ....................................26

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955,
167 L.Ed.2d 929 (2007) .......................................................................................2, 26

*Brewer v. Hayne*, 860 F.3d 819 (5th Cir. 2017)  ..................................................... 15-16

*Briscoe v Lahue*, 460 U.S. 325; 103 S. Ct. 1108; 75 L. Ed. 2d 96 (1983) ..................23

*Carroll v. Wilkerson*, 782 F.2d 44 (6th Cir. 1986) ...........................................................5

*Collins v. Nagle*, 892 F.2d 489 (6th Cir. 1989)............................................................ 1-2

*Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ...............................2

*County of Sacramento v Lewis*, 523 U.S. 833; 118 S. Ct. 1708 ; 140 L. Ed. 2d 1043
(1998) ...........................................................................................................................9

*Daniels v Williams*, 474 U.S. 327; 106 S. Ct. 662; 88 L. Ed. 2d 662 (1986) ...............9

*Dibrell v. City of Knoxville, Tennessee*, 984 F.3d 1156 (6th Cir. 2021)........................5

*Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595 (1982)  ..................................................17

*Fieger v. Cox*, 524 F.3d 770 (6th Cir. 2008)  ................................................................26

*Forrester v. White*, 484 U.S. 219; 98 L. Ed. 2d 555; 108 S. Ct. 538 (1988) ............. 8-9

*Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) ...................... 13-14

*Gregory v City of Louisville*, 444 F.3d 725 (6th Cir. 2006) ....................................11,23

*Gutierrez v. Lynch*, 826 F.2d 1534 (6th Cir. 1987) ......................................................26

*Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)  8

*Heck v. Humphrey*, 512 U.S. 477 (1994)  ......................................................................5

iv

*Hensley v. Gassman*, 693 F.3d 681 (6th Cir. 2012) .....................................................26

*Hooks v. Hooks*, 771 F.2d 935 (6th Cir. 1985) .............................................................26

*Jackson v. City of Columbus*, 194 F.3d 737 (6th Cir. 1999) .........................................19

*Lawyer v. Kernodle,* 721 F.2d 632 (8th Cir. 1983) ................................................. 12-13

*Lewellen v. Metropolitan Gov't,* 34 F.3d 345 (6th Cir. Tenn. 1994) ...........................10

*Macko v. Byron*, 760 F.2d 95 (6th Cir. 1985) (*per curiam*) .........................................23

*Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (2017) ......................................................5

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) ............................ 11-12, 23

*New England Health Care Employees Pension Fund v. Ernst & Young, LLP*,
336 F.3d 495 (6th Cir. 2003) ................................................................................ 19-20

*People v Miller*, COA # 346321 (unpublished; August 6, 2020) ........................... 20-21

*People v Miller*, COA # 346321 (unpublished; April 8, 2021) .............................. 21-22

*Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004) ....................................................14

*Reynolds v. C.I.R.*, 861 F.2d 469 (1988) ................................................................ 17-18

*Saucier v. Katz*, 533 U.S. 194; 121 S. Ct. 2151; 150 L. Ed. 2d 272 (2001) ..................8

*Sheffey v. City of Covington*, 564 F. App'x 783 (6th Cir. 2014) .................................27

*Spadafore v. Gardner*, 330 F.3d 849 (6th Cir. 2003) ..................................................26

*Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999).......................................... 8, 10-11

*Stemler v City of Florence*, 126 F.3d 856 (6th Cir. 1997) ..........................................10

*Teledyne Industries, Inc. v. N.L.R.B.*, 911 F.2d 1214 (1990) ......................................18

*Turner v. Scott*, 119 F.3d 425 (6th Cir.1997) ..............................................................27

*Wallace v. Kato*, 549 U.S. 384 (2007)..........................................................................5

### 1. **<u>Introduction.</u>**

On October 9, 2001, Plaintiff Tonia Miller called emergency responders after her infant daughter stopped breathing. The child passed away later that day, and an autopsy characterized the death as a homicide caused by abusive head trauma. Defendant-Appellant Dr. Hunter performed the autopsy, and he made three findings which were generally considered to be effectively diagnostic of head trauma at the time. Plaintiff was subsequently charged and convicted of second-degree murder on April 14, 2003.

Over the 10-20 years, there was some change in the way that the medical community approached the "triad" of findings which Dr. Hunter relied on (subdural hematoma, retinal hemorrhage, and encephalopathy). In 2017, four medical experts examined the case at the request of The Innocence Project. That led to a motion for a new trial in 2018 which was initially unsuccessful. Plaintiff sought relief in the Michigan Court of Appeals, and on remand, her conviction was set aside in January 2021. Plaintiff's argument was based on the argument that Dr. Hunter had followed the conventional wisdom of the time and changes in that conventional wisdom constituted new evidence.

Plaintiff now alleges that Dr. Hunter violated her civil rights by following the widely accepted beliefs of the medical community regarding abusive head trauma. However, she now characterizes his actions as a deliberate and knowing fabrication of evidence. Dr. Hunter submits that Plaintiff has failed to state a claim upon which relief can be granted, as taken up hereinafter.

### 2. **<u>Standard of Review.</u>**

The motion is brought under Fed. R. Civ. P. 12(b)(6), which allows a defendant to challenge whether the plaintiff has pled allegations which state a claim upon which relief

can be granted. In considering such a motion, the complaint is construed in the light most favorable to the plaintiff and well-pleaded allegations of fact in the complaint are accepted as being true. *Collins v. Nagle*, 892 F.2d 489, 493 (6th Cir. 1989).

In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) the Supreme Court explained that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 1964–65 (citations and quotation marks omitted). Additionally, the Court emphasized that even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id*. (internal citation and quotation marks omitted). The Court explained that, although *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) had followed "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief", and that *Conley* was "an incomplete, negative gloss on an accepted pleading standard." *Twombly*, 127 S.Ct. 1969.

To survive a Rule 12(b)(6) motion to dismiss, plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir.2007). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 668, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. "[A] complaint

2

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*.

### 3.  <u>Plaintiff's Allegations as Pled.</u>

Plaintiff's allegations against Dr. Hunter are obviously central to the present motion. The pertinent paragraphs of Plaintiff's Complaint are set forth in this section by paragraph number (their content is analyzed in the following section of this brief):

> 3) Both Dr. Hunter and Dr. Robert Beck ignored the open and obvious cause of death from pneumonia in favor of the criminal charge of child abuse despite the clear indications available from the medical history, Tonia Miller's statements, and the medical evidence of lung damage and other complications that pointed toward natural causes for the death of A.D.

> 15) Doctor Brian Hunter was the forensic pathologist at Sparrow Hospital who provided autopsy services on behalf of the Kalamazoo County Medical Examiner's Office.  At all times relevant to this action, Dr. Brian Hunter was a state actor insofar as he engaged with Defendants Hurtt, Peck, Bell and Beck in conducting the investigation that led to Plaintiff's wrongful conviction, conspired with the Defendants to secure Plaintiff's wrongful conviction, and was serving a public function and/or was given the authority by Defendant Officer Hurtt to identify a perpetrator of the murder for which Plaintiff was wrongfully convicted.

> 27) A blood draw was taken shortly after A.D. 's arrival. Results demonstrated the presence of staphylococcus hominis, bacteria that can cause severe and fatal pneumonia in infants.

> 32) Two days later, Dr. Brian Hunter conducted an autopsy of A.D., which Detective Tim Hurtt attended.

> 33) Dr. Hunter listed A.D. 's manner of death as "homicide." In the same paragraph, Dr. Hunter wrote that "the ... findings in this case strongly indicate that shaking is the mechanism that caused these injuries[.]" The first three findings he listed in the

3

autopsy report were the components of the triad: subdural hemorrhaging, retinal hemorrhaging, and cerebral edema (brain swelling). While he did not rule out blunt-force trauma, he noted that "there are no scalp bruises or skull fractures to indicate points of impact." He noted the presence of a subdural membrane (meaning an older, healing injury), but believed it"[ did] not explain the fresh subdural blood and cannot be considered its source." He went on to say that "[a] subdural hemorrhage associated with birth cannot be ruled out."

34) While SBS was a common diagnosis in the medical community at this time based on the triad of symptoms, it was also clear in the medical community that acute pneumonia could cause the same symptoms.

35) Dr. Hunter's autopsy notes "acute bronchopneumonia and congestion," however, he deliberately omitted information that would have pointed toward pneumonia as the cause of death, to wit:

    a. A.D. 's significant history of apneic episodes that were documented in her medical records;

    b. the positive result for staphylococcus hominis from A.D. 's blood culture at BCSH the day before her death;

    c. a chest x-ray at Bronson Hospital showed bilateral lung opacities the day before her death; and

    d. the autopsy report's respiratory system review was incomplete and wildly inaccurate, omitting any description or reference to the obvious sections of interstitial and necrotizing pneumonia that are visible in the lung slides.

36) Dr. Hunter and Detective Hurtt discussed and decided to deliberately downplay A.D. 's obvious pneumonia and wrongfully conclude instead that there was "overwhelming evidence ... that this child had been shaken beyond normal and that the shaking undoubtedly caused the child's death[.]"

37) Based on this deceptive conclusion, Detective Hurtt arranged to arrest Ms. Miller.

55) The combination of pneumonia and other natural causes was open and obvious at the time that the Defendants conspired to fabricate evidence and sustain the wrongful conviction of Tonia Miller.

4

Paragraphs 42-45 allege that Dr. Hunter testified falsely in prior court proceedings. These allegations will be addressed separately under the topic of absolute immunity.

4. **<u>Plaintiff's Claims are Barred by the Applicable Statute of Limitations.</u>**

Plaintiff's claims against Dr. Hunter are, for the most part, brought under 42 USC 1983. While section 1983 is used to enforce federal rights, not common law torts, the statute still "creates a species of tort liability." *Dibrell v. City of Knoxville, Tennessee*, 984 F.3d 1156, 1159 (6th Cir. 2021) (citation omitted). Thus, the common law of torts generally provides the "contours and prerequisites of a § 1983 claim, including its rule of accrual." *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 (2017). Section 1983 claims are subject to Michigan's three-year statute of limitations for personal injury claims. *Carroll v. Wilkerson*, 782 F.2d 44 (6th Cir. 1986).

Malicious prosecution is admittedly subject to its own limitations period. A malicious prosecution-type claim generally does not accrue until the "conviction or sentence" has been "invalidated" in some way. *Wallace v. Kato*, 549 U.S. 384, 392 (2007), citing *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). However, this claim is also untimely, based on the following timeline.

It is a matter of public record that Plaintiff's conviction was overturned on January 25, 2021. The three-year clock applicable to malicious prosecution began running then, and it expired on January 25, 2024. Additionally, while Plaintiff's 1983 personal injury claims had accrued many years ago following her conviction, to the extent that the statute of limitations had not expired long ago, their three-year clock also would have expired no later than January 25, 2024. When Plaintiff filed the complaint herein on March 14, 2024, she was already too late. All of her claims against Dr. Hunter are untimely.

5

**5.  Plaintiff's Claims Sound in Negligence.**

Assuming for the sake of argument that the complaint in this matter had been timely filed, Plaintiff's claims are nonetheless defeated by another problem. Although she has tried to phrase it otherwise, her claims sound in ordinary negligence and such claims are barred by qualified immunity.

**a.  Plaintiff's Complaint Includes Both Factual and Conclusory Allegations.**

When the allegations against Dr. Hunter in the complaint are reviewed, they are seen to include some allegations of fact[1], along with a number of allegations which amount to nothing more than conclusions. The table below lays out the key terms from the complaint, and labels them as fact or conclusion (the writer of this brief submits that they are accurately labeled, but the reader is obviously free to exercise independent judgment).

| | |
|---|---|
| 3 – Dr. Hunter "ignored" the "clear indications" of pneumonia | Conclusion |
| 15 – Dr. Hunter provided autopsy services and was a state actor | Fact |
| 15 – Dr. Hunter "conspired" with other Defendants | Conclusion |
| 27 – a blood sample found bacteria which can cause pneumonia | Fact |
| 32 – Dr. Hunter performed the autopsy | Fact |
| 33 – Dr. Hunter's report characterized the manner of death as homicide | Fact |
| 33 – Dr. Hunter including findings suggestive of shaking as a cause of injury, but could not rule out blunt force trauma or birth injury | Fact |
| 34 – Shaken Baby Syndrome was a common diagnosis, but acute pneumonia could cause the same symptoms | Fact |

---

[1] The truth or falsity of these allegations is not at issue in this motion, only their nature as either fact or conclusion.

| | |
|---|---|
| 35 – Dr. Hunter "deliberately omitted" evidence of pneumonia which was in various medical records | Conclusion |
| 36 – Dr. Hunter discussed the situation with Detective Hurtt and they "deliberately downplayed . . . obvious pneumonia" | Conclusion |
| 37 – Detective Hurtt relied on this "deceptive conclusion" | Conclusion |
| 55 – "The combination of pneumonia and other natural causes was open and obvious . . ." | Conclusion |

### b.  The Specific Facts Alleged in Plaintiff's Complaint Support, at Best, a Claim of Negligence.

The allegations reviewed in the preceding section reveal that Plaintiff has taken a small amount of evidence and has turned it into something far beyond what the evidence can support. When the concrete, specific factual assertions are compiled, we are left with the claim that Dr. Hunter performed the autopsy, identified evidence consistent with abusive head trauma, and he described the evidence as consistent with shaking but did not rule out trauma or birth injury. Additionally, Plaintiff asserts that Shaken Baby Syndrome was a common diagnosis at the time (although there is no allegation whatsoever that Dr. Hunter ever used those words or made that diagnosis).

It is respectfully submitted that the limited factual allegations in the complaint cannot reasonably be argued to support any claim other than negligence. A fair and open-minded reading of Plaintiff's allegations leads to the conclusion that Plaintiff accuses him of forming an incorrect diagnosis after he did the autopsy. Plaintiff admittedly does make a number of other allegations against Dr. Hunter. However, they all relate to Plaintiff's conclusions about his state of mind and his motives. There is nothing factual in the allegations. Plaintiff's conspiratorial accusations of collusion with the other individual Defendants are unsupported by any specific allegation of fact. All we have is the claim that the medicine showed something other than homicide, and Dr. Hunter got it wrong.

7

**6.  Allegations of Negligence Fail to State a Viable 1983 Claim of Violation of Constitutional Rights as Qualified Immunity Applies.**

It is well established in the case law that qualified immunity applies to state actors accused of 1983 violations. That law precludes claims against agents of the state for claims which constitute no more than negligence. The case law is discussed below.

**a.  The Case Law on Qualified Immunity Generally.**

Our Supreme Court explained the rule of qualified immunity in *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982), writing:

> Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

When evaluating a qualified immunity defense as a basis for summary judgment, the Court must examine two prongs (in either order): (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right and (2) whether the constitutional right alleged to have been violated was "clearly established." *See Saucier v. Katz*, 533 U.S. 194, 201; 121 S. Ct. 2151; 150 L. Ed. 2d 272 (2001).

In *Spurlock v. Satterfield*, 167 F.3d 995, 1005 (6th Cir. 1999) the Court explained that "the burden is on the plaintiff to allege and prove that the defendant violated a clearly established constitutional right."

The opinion released in *Forrester v. White*, 484 U.S. 219; 98 L. Ed. 2d 555; 108 S. Ct. 538 (1988) provides insight into the rationale behind qualified immunity:

> **By its nature, however, the threat of liability can create perverse incentives that operate to inhibit officials in the proper performance of their duties. In many contexts, government officials are expected to make decisions that are impartial or imaginative, and that above all are informed by considerations**

8

**other than the personal interests of the decisionmaker**.  Because government officials are engaged by definition in governing, their decisions will often have adverse effects on other persons. **When officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct**. *Id* at 223 (emphasis added).

In the context of 1983 civil rights claims, the case law clearly establishes that qualified immunity applies to conduct which amounts to nothing worse than negligence. In *Daniels v Williams*, 474 U.S. 327; 106 S. Ct. 662; 88 L. Ed. 2d 662 (1986) the Court rejected negligence as a basis for a constitutional claim, writing:

> **We conclude that the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property**. *Id* at 328 (italics in original; emphasis added).

> \* \* \* \*

> The Due Process Clause of the Fourteenth Amendment provides: "[Nor] shall any State deprive any person of life, liberty, or property, without due process of law." Historically, **this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property**. **No decision of this Court before *Parratt* supported the view that negligent conduct by a state official, even though causing injury, constitutes a deprivation under the Due Process Clause**. *Id* at 331 (emphasis added).

> \* \* \* \*

> **Where a government official's act causing injury to life, liberty, or property is merely negligent, "no procedure for compensation is *constitutionally* required**." *Id* at 333 (italics in original; citation and footnote omitted; emphasis added).

Two years later, in *County of Sacramento v Lewis*, 523 U.S. 833; 118 S. Ct. 1708 ; 140 L. Ed. 2d 1043 (1998), the Court made the following observation:

> We have accordingly rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct and have held that the Constitution does not guarantee due care on the part of state officials; **liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process**. *Id* at 848-849 (emphasis added).

9

The Sixth Circuit applied the same analysis in *Ahlers v. Schebil*, 188 F.3d 365, 372-373 (6th Cir. Mich. 1999) and wrote:

> **A successful § 1983 claimant must establish that the defendant acted knowingly or intentionally to violate his or her constitutional rights**, *id*. at 815, 102 S. Ct. at 2737, **such that mere negligence or recklessness is insufficient**. (Emphasis added.)

Analysis from *Lewellen v. Metropolitan Gov't,* 34 F.3d 345, 348 (6th Cir. Tenn. 1994) includes:

> In the case at bar, however, the defendants obviously did not make a deliberate decision to inflict pain and bodily injury on the plaintiff. The defendants may have been negligent, but **it is now firmly settled that injury caused by negligence does not constitute a "deprivation" of any constitutionally protected interest**. [Emphasis added.]

Similarly, *Stemler v City of Florence*, 126 F.3d 856 (6th Cir. 1997) the Court wrote:

> Under law that was clearly established in 1994, Wince would have violated *Stemler's* right to due process if he knowingly fabricated evidence against her, and if there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.

The consistent strain running through these decisions is that there is no constitutional guarantee that accidents will not happen, and negligence will not establish a violation of a constitutional right.

### b. The Case Law Specific to Fabrication of Evidence.

There are a few opinions which have specifically addressed fabrication of evidence, including three from this circuit. The earliest is *Spurlock, supra*. The case involved the interactions between police officers and suspects who allegedly conspired to frame another individual. The detailed factual discussion covers four pages of the opinion. *Id* at 167 F.3d 997-1,000. After reviewing the parameters of qualified immunity, the Court explained that fabrication of evidence defeated any claim of qualified immunity, writing:

10

> We conclude that, here, plaintiffs sufficiently raised claims that allege violations of their constitutional and/or statutory rights. Namely, that Satterfield and other defendants wrongfully investigated, prosecuted, convicted and incarcerated them; that Satterfield fabricated evidence and manufactured probable cause; that they were held in custody, despite a lack of probable cause to do so; and that Satterfield and others conspired to maliciously prosecute and convict them. Satterfield cannot seriously contend that a reasonable police officer would not know that such actions were inappropriate and performed in violation of an individual's constitutional and/or statutory rights. *Id* at 1005 (footnote and citations omitted).

The Court denied qualified immunity based upon these factors. This is a logical basis and reflects sound reasoning.

*Gregory v City of Louisville*, 444 F.3d 725 (6th Cir. 2006) involved a claim where intentional or reckless acts or omissions had actually occurred. The Court explained the claim:

> Plaintiff alleges that Katz knowingly withheld the existence of two "non-matching" head hairs from the recovered pantyhose, or in the alternative, that she withheld knowledge that none of the hairs "matched." Plaintiff presents evidence that 7 "negroid" hairs were recovered from the pantyhose, while Katz's forensic report showed only 5 hairs, all of which Katz "matched" with Plaintiff. This presents sufficient evidence such that a reasonable jury could conclude that Plaintiff's allegations are correct. . . . If Plaintiff's allegations are correct, then Katz deliberately withheld the existence of those two nonmatching hairs. Katz "cannot seriously contend that a reasonable [investigator] would not know that such actions were inappropriate and performed in violation of an individual's constitutional . . . rights." *Id* at 744 (citation omitted).

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) specifically addressed forensic investigators. The plaintiff was convicted of kidnaping and sexual assault. After new evidence and a discredited witness, he was released. He filed a civil rights action. The Court succinctly summarized the issue:

> Broadly speaking, Moldowan alleges that the Defendants--both acting separately and conspiring together--violated his civil rights by fabricating evidence against him, failing to disclose exculpatory evidence, and pursuing

11

his prosecution and retrial without probable cause. *Id* at 363.

Plaintiff alleged that a physician had **"either intentionally or with deliberate indifference** and/or with **reckless disregard of the truth** and of [Moldowan's] constitutional rights, **fabricated evidence and withheld impeaching and exculpatory evidence** from the Macomb County Prosecutor and from [Moldowan's] defense counsel." *Id* at 396 (emphasis added). Following *Gregory,* the Court held that "**a forensic expert may be subject to suit under § 1983 for deliberately withholding the existence of exculpatory forensic evidence or fabricating forensic evidence**." *Id* at 397 (emphasis added).

The common theme through each of these decisions is intentional or reckless behavior. Each opinion specifically references this as the basis for decision. The same rule is applied elsewhere, as discussed hereinafter.

Qualified immunity has been addressed in various settings in other Circuit Courts. Three opinions which evaluated immunity in an autopsy setting are enlightening. In *Lawyer v. Kernodle,* 721 F.2d 632 (8th Cir. 1983), the Court addressed the dichotomy between negligence and intentional wrongdoing in that context, and wrote:

> It has generally been held that coroners enjoy a qualified immunity when performing their official functions for the state. Other courts have found private physicians to be immune when performing official functions of the state. *Id* at 635-636 (citations omitted).

> * * * *

> We believe that Kernodle should enjoy the same immunity that "investigators for the state prosecutor" enjoy. Kernodle was determining the cause of death of Diana Lawyer and this determination was to be used in the prosecutor's decision whether to institute criminal charges. The deprivation alleged by Lawyer is directly related to the institution of these criminal charges. **Even if Dr. Kernodle performed the autopsy negligently, in doing so he did not violate "clearly established statutory or constitutional rights"** of Lawyer. We therefore affirm the district

12

court's judgment that Dr. Kernodle was entitled to qualified immunity.  *Id* at 636 (emphasis added).

A relevant opinion was issued in *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). The Court considered "a claim that **a county coroner falsified an autopsy report**, leading to the false arrest and prosecution of plaintiff Nelson Galbraith for murder in violation of his constitutional rights." *Id* at 1121 (emphasis added).

> Dr. Ozoa's autopsy report . . . states that external examination of the neck revealed "somewhat transverse wrinkle marks but … no evidence of injury" and internal examination revealed that "the hyoid, larynx, trachea, soft tissues and cervical spine are unremarkable and show no evidence of injury." Despite this apparent lack of injury to the neck, both internally and externally, Dr. Ozoa concluded that the cause of death was asphyxia due to ligature strangulation by an assailant. Galbraith alleges that this conclusion was a result of Dr. Ozoa's "incompetence" and that Dr. Ozoa deliberately attempted to cover up his incompetence from this point forward. *Id* at 1122.

Galbraith was acquitted by a jury. Subsequently, the body was exhumed and an expert who examined it concluded that the defendant physician must have lied by claiming that he had examined certain structures. The district court granted a 12(b)(6) motion to dismiss the complaint. The Court found the allegations in the complaint to be sufficient:

> [A] § 1983 plaintiff must show that the investigator "**made deliberately false statements or recklessly disregarded the truth** in the affidavit" and that the falsifications were "material" to the finding of probable cause.
>
> Neither side has challenged the district court's application of these warrant affidavit cases to the present facts, and we agree, without deciding any issue of immunity, that **a coroner's reckless or intentional falsification of an autopsy report that plays a material role in the false arrest and prosecution of an individual can support a claim under 42 U.S.C. § 1983 and the Fourth Amendment**. Galbraith claims that Dr. Ozoa recklessly disregarded the truth by asserting in his autopsy report that Josephine was strangled by an assailant while **ignoring abundant evidence that pointed to suicide**. The amended complaint also describes deficiencies in the autopsy itself tending to indicate that **Dr. Ozoa never did the work he claimed he had done** to support his conclusion that Josephine's death was caused by an assailant. Finally, the amended complaint alleges that **Dr. Ozoa deliberately lied about the autopsy in the autopsy report, in his**

13

**communications with other investigators, and on the witness stand at the preliminary hearing in order to cover up his incompetence**, and that these lies proximately caused Galbraith's arrest and prosecution for murder. The amended complaint therefore adequately alleges a Fourth Amendment violation. *Id* at 1126-1127 (emphasis added).

The basis for the Court's ruling is clear. Galbraith had pled a viable case because he alleged "reckless or intentional falsification" and that the doctor "made deliberately false statements or recklessly disregarded the truth . . . ."

The Tenth Circuit weighed in with *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004). The Court explained the relevant issue:

The gravamen of Mr. Pierce's complaint is that Ms. Joyce Gilchrist, a forensic chemist for the Oklahoma City Police Department ("OCPD"), **fabricated inculpatory evidence and disregarded exculpatory evidence**, which led prosecutors to indict and prosecute Mr. Pierce for the rape. *Id* at 1281 (emphasis added).

An FBI investigation of the doctor concluded that she had made contrived and erroneous statements in five of eight cases reviewed. As to plaintiff Pierce, the investigation concluded that hairs from the scene and Pierce's body did not match, contrary to Gilchrist's statements. *Id* at 1283. In determining whether a viable constitutional claim had been pled, the Court wrote:

Applying these principles, we conclude that Mr. Pierce has met his pleading requirements. He alleges that Ms. Gilchrist, with **knowing and reckless disregard for the truth**, informed the police and prosecutorial authorities that hair analysis supported Pierce's involvement in the rape - even though in fact, far from implicating him in the rape, the hair analysis tended to exonerate him - and disregarded findings that Mr. Pierce's blood contained an enzyme that exonerated him of being the source of the sperm found on the rape victim. Although at this stage of the litigation it is too early to judge the facts of the matter, these allegations are sufficient to survive a motion to dismiss. *Id* at 1293-94 (emphasis added).

Once again, deliberate or reckless actions were the basis for denying qualified immunity. Neither *Pierce* nor any other case cited by the parties denied immunity for good

14

faith mistakes.

The most recent pertinent decision was released in *Brewer v. Hayne*, 860 F.3d 819 (5th Cir. 2017). The situation is similar to the one before this Court in many important particulars. Claims against two doctors alleged that they had "provided investigators with—and later testified to—baseless findings regarding bite marks on the victims' bodies; that they knew that the evidence was baseless or at least acted with reckless disregard of that reality." *Id* at 821. Both doctors were supposed experts in bite marks, and frequently consulted in criminal cases. After discussing applicable law, the Court explained:

> We have previously held that "deliberate or knowing creation of misleading and scientifically inaccurate [evidence] amounts to a violation of a defendant's due process rights," and that reasonable officers know of this right. *Id* at 824.

The Court noted that, although forensic bite evidence has for the most part been discredited, it was still accepted at the time of the treatment at issue. *Id* at 824. After reviewing the specific allegations, the Court held:

> **Plaintiffs have made a compelling showing that Defendants were negligent in their forensic analysis, but negligence alone will not defeat qualified immunity**. Viewed in the most favorable light, Plaintiffs' **evidence is not suggestive of an intent to fabricate**. **The disagreement voiced by Plaintiffs' experts is evidence that Defendants were mistaken in their conclusions or methodologies, but no more**. Likewise, the evidence of the "extraordinary frequency" with which Defendants found bite mark evidence certainly undermines the reliability of the forensic odontology techniques they employed—and perhaps the field in general—but does not lead to an inference of intentional fabrication. *Id* at 825 (emphasis added).

> * * * *

> Absent some additional evidence, the autopsy form and the result of the biopsy in the Brooks case are not sufficient to raise a reasonable inference that Dr. Hayne either deliberately failed to perform biopsies or withheld exculpatory evidence. **At most, Plaintiffs have presented evidence that Dr. Hayne was negligent in failing to perform the biopsies or in failing**

15

**to examine biopsied tissues. Ultimately, we think that true of all the evidence in the record: viewed in its entirety and in the light most favorable to Plaintiffs, the record tends to show that Defendants were negligent—perhaps grossly so—but no more.**

**Plaintiffs have failed to raise a genuine issue of fact as to whether Defendants violated their right to due process by intentionally creating false or misleading scientific evidence.** Defendants were entitled to summary judgment under the defense of qualified immunity. *Id* at 826 (emphasis added).

It would be hard to find analysis which is more directly on point. *Brewer* recognizes that, in a case such as the present one, a plaintiff must prove intentional or reckless wrongdoing to avoid governmental immunity. The district court was correct in so holding.

The above cases lead to one inescapable conclusion. When a physician preforming an autopsy forms conclusions which are later challenged, there is no viable 1983 claim unless the plaintiff can show some form of intentional or reckless behavior and, if all the plaintiff can show is a disagreement about the medicine, qualified immunity bars any claims against that physician.

7.  **The Doctrine of Judicial Estoppel Bars Plaintiff from Alleging Any Theory Other Than Negligence.**

The review of the complaint earlier in this brief reveals that the core of Plaintiff's claim is that Dr. Hunter made a mistake. There is a separate reason to conclude that negligence is really the central theme. Plaintiff has taken the position that Dr. Hunter acted negligently in court proceedings prior to this action. Plaintiff filed a successful appeal, and her criminal conviction was overturned based on newly discovered evidence. That new evidence was a shift in medical thinking in the years since the autopsy and her conviction. Plaintiff prevailed on the argument that Dr. Hunter had simply followed the medical beliefs which were generally accepted at the time. She even argued that she would have been unable to

16

find an expert witness who would support her defense, as almost everyone agreed that the findings from the autopsy pointed directly at child abuse. The doctrine of judicial estoppel precludes her from now arguing otherwise.

### a. Judicial Estoppel Bars a Party from Asserting a Position which Contradicts a Position Successfully Taken in a Prior Proceeding.

Judicial estoppel is an established doctrine with defined parameters. Relevant analysis is found in *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598-599 (1982):

> The doctrine of judicial estoppel applies to **a party who has successfully and unequivocally asserted a position in a prior proceeding**; he **is estopped from asserting an inconsistent position in a subsequent proceeding**. *Smith v. Montgomery Ward & Co.*, 388 F.2d 291, 292 (6th Cir. 1968). See *City of Kingsport v. Steel & Roof Structure, Inc.*, 500 F.2d 617, 620 (6th Cir. 1974) (success in prior proceeding necessary). Unlike equitable estoppel, **judicial estoppel may be applied even if detrimental reliance or privity does not exist**. See *Konstantinidis v. Chen*, 200 D.C.App. 69, 626 F.2d 933, 937 (1980). This distinction reflects the difference in the policies served by the two rules. Equitable estoppel protects litigants from less than scrupulous opponents. Judicial estoppel, however, is intended to protect the integrity of the judicial process. *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982); *Konstantinidis v. Chen*, 626 F.2d at 937; *Scarano v. Central R. Co.*, 203 F.2d 510, 512-13 (3rd Cir. 1953) ("such use of inconsistent positions would most flagrantly exemplify that playing 'fast and loose with the courts' which has been emphasized as an evil the court should not tolerate.") **The essential function of judicial estoppel is to prevent intentional inconsistency**; the object of the rule is to protect the judiciary, as an institution, from the perversion of judicial machinery. See *Allen v. Zurich Ins. Co.,* 667 F.2d at 1167; *Konstantinidis v. Chen*, 626 F.2d at 939. Collateral estoppel is essentially a finality rule, which serves to conserve judicial resources by precluding the litigation of issues previously decided. Judicial estoppel addresses the incongruity of allowing a party to assert a position in one tribunal and the opposite in another tribunal. If the second tribunal adopted the party's inconsistent position, then at least one court has probably been misled. See *Konstantinidis v. Chen*, 626 F.2d at 938. [Emphasis added.]

Like analysis is found in *Reynolds v. C.I.R.*, 861 F.2d 469, 472 (1988):

17

The judicial estoppel doctrine protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding. *Edwards v. Aetna Life Insurance Co.,* 690 F.2d 595, 598 (6th Cir.1982); *Patriot Cinemas, Inc. v. General Cinema Corp.,* 834 F.2d 208, 212 (1st Cir.1987). The purpose of the doctrine is to protect the courts "from the perversion of judicial machinery." *Edwards,* 690 F.2d at 599. **Courts have used a variety of metaphors** to describe the doctrine, characterizing it as a rule against "playing 'fast and loose with the courts,' " *Scarano v. Central R.R.,* 203 F.2d 510, 513 (3d Cir.1953), "blowing hot and cold as the occasion demands," *Allen v. Zurich Insurance Co.,* 667 F.2d 1162, 1167 n. 3 (4th Cir.1982), or **"hav[ing] [one's] cake and eat [ing] it too**," *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1177 (D.S.C.1974). *Id* at 472. [Emphasis added.]

Also pertinent is analysis from *Teledyne Industries, Inc. v. N.L.R.B.*, 911 F.2d 1214 (1990):

**Judicial estoppel** is an equitable doctrine that preserves the integrity of the courts by **preventing a party** from abusing the judicial process through cynical gamesmanship, **achieving success on one position, then arguing the opposite to suit an exigency of the moment**. *See Scararo v. Central R.R.,* 203 F.2d 510, 513 (3d Cir.1953) (judicial estoppel precludes a party from "playing fast and loose with the courts"). **In order to invoke judicial estoppel, a party must show that the opponent took a contrary position under oath in a prior proceeding and that the prior position was accepted by the court**. *Reynolds,* 861 F.2d at 472–73. *Id* at 1217-1218 [footnote omitted; emphasis added].

****

In nearly a mirror image to collateral estoppel, judicial estoppel consistently protects the integrity of the court by **estopping a party whenever it has previously persuaded a court to make a decision contrary to the party's current position**. Judicial estoppel is not bounded by the limits of mutuality and finality that protect the parties in collateral estoppel. See, e.g., *Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469 (6th Cir.1988). *Id* at 1220 [emphasis added].

Judicial estoppel as explained above would seem particularly applicable if, for example, a person was to appeal a criminal conviction by arguing that the medical science behind the conviction had changed over time. That is exactly what Plaintiff herein did, as

18

established by the court records discussed in the next section.

### b. Plaintiff Successfully Asserted in a Prior Proceeding that Newly Discovered Evidence Established that Dr. Hunter Acted Negligently in Following the Then Prevailing Medical Understanding of Abusive Head Trauma.

Plaintiff alleges that Dr. Hunter deliberately fabricated evidence and conspired with others to help convict her. However, it is a matter of record that she took a contrary position in prior proceedings, and that position resulted in the overturning of her conviction. Confirmation of this is found in opinions by the Michigan Court of Appeals.

Court of Appeals opinions are a matter of public record, and this Court may take judicial notice of them. The subject was taken up in *Jackson v. City of Columbus*, 194 F.3d 737, 745-746 (6th Cir. 1999), where the Court wrote:

> Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim. See id. at 89. Courts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies. See, e.g., *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir.1997) (public records); *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir.1996) (judicial notice); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1197 (3d Cir.1993) (letter decisions of governmental agencies).

> On appeal, Jackson specifically argues that the district court improperly considered a December 30, 1996 decision rendered by the Civil Service Commission and documents from Jackson's state court mandamus case. The December 30, 1996 decision of the Civil Service Commission, however, was a matter of public record and was referred to in Jackson's complaint. The documents from Jackson's state court mandamus case were also public records in a related case. Both of these documents were therefore properly considered by the district court. *Id* at 745-746.

In *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) the Court explained:

> A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice. See, e.g., *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir.1999), abrogated on other grounds, *Swierkiewicz v. Sorema N.A.*,

19

534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). New England's complaint against Fruit, therefore, is properly a part of the record before us.

Plaintiff's conviction was considered by the Michigan Court of Appeals three times. It was affirmed in 2004, and that opinion does not seem relevant to the present discussion. However, the second appeal came after the changes in medical knowledge which constitute the newly discovered evidence which Plaintiff relied on to challenge her conviction. The opinion from that appeal demonstrates that Plaintiff's successful argument was that Dr. Hunter had followed prevailing medical knowledge when performing the autopsy, and that the prevailing understanding has changed. This is shown by the following excerpts from *People v Miller*, COA # 346321 (unpublished; August 6, 2020):

> **During the nearly two decades since Miller's conviction, the science underlying the diagnosis of SBS/AHT has evolved**. Miller contends that in 2003, **the "classic trio" findings** of subdural blood, cerebral edema, and retinal hemorrhage, **axiomatically evinced a violently and intentionally shaken child**. She claims that **recent scientific advancements have led to a wholesale reassessment** of the assumptions that previously dominated SBS/AHT science. Her evidence includes expert reports attributing Alicia's death to pneumonia.
>
> **In the wake of the shift in scientific and medical opinion** and the analyses conducted by her experts, Miller sought relief from judgement under MCR 6.500, contending that newly discovered evidence warranted a new trial. The trial court summarily rejected Miller's arguments, denied her the opportunity to present any evidence in support of her motion, and expressed formed opinions regarding Miller's guilt and the invalidity of her expert's views. We reverse and remand for an evidentiary hearing before a different judge and retain jurisdiction. *Id* at 1 [emphasis added].
>
> ****
>
> One of the affiants, Dr. Janice Ophoven, described **the evolution in medical and scientific thought regarding the diagnosis of SBS/AHT** as follows . . . At the time of trial, Dr. Hunter's testimony was consistent with the predominant views in the forensic pathology community, as evidenced by a 2001 position paper of the National Association of Medical Examiners (NAME). The 2001 NAME paper on SBS essentially endorsed the triad as diagnostic of SBS. However, since the time

20

of trial, **scientific research has caused a significant shift** in the forensic pathology community. Today, the triad is no longer widely accepted as diagnostic of SBS in the forensic pathology community. *Id* at 1-2 [emphasis added].

\*\*\*\*

Miller's motion for relief from judgment raised the following factual allegations:

> 13. **Dr. Hunter's diagnosis aligned with the prevailing belief** in the medical community at the time of [defendant's] trial in 2003. At that time, it was widely believed that the presence of the triad was diagnostic of abuse by shaking. *Id* at 3[emphasis added].

\*\*\*\*

> 15. **Even the defense's expert witness agreed** that Alicia's injuries were consistent with child abuse. His only objection to the prosecution's theory of the case was grounded in the possibility that Alicia could have been injured up to a week prior to her death, rather than mere hours before it. *Id* at 5[emphasis added].

\*\*\*\*

> 19. **In the 15 years since [defendant's] trial, it has become generally understood in the scientific community that the "triad,"** once thought to be necessarily diagnostic of SBS, **now has a wide array of alternative causes**. *Id* [emphasis added].

The case was remanded to the trial court for an evidentiary hearing. The trial judge subsequently granted Plaintiff's motion for a new trial. This resulted in a third round in the Court of Appeals after the prosecutor appealed. The follow excerpts from *People v Miller*, COA # 346321 (unpublished; April 8, 2021) are relevant:

> The trial court explained in a lengthy bench opinion that **Miller had established a "shift in the scientific consensus"** regarding whether a presumptive diagnosis of AHT premised solely on the presence of the three findings remained scientifically valid. The court observed that this shift had resulted in a recognition among many physicians that "there are alternative reasons or alternative mechanisms that can cause those three findings to appear." Therefore, the court concluded, **the science relied on by Miller was "newly discovered."** *Id* at 2 [emphasis added].

\*\*\*\*

21

Here, the evidence of consequence consisted of expert testimony linking the medical and autopsy findings to Miller's alleged conduct. Alternatively stated, Miller's conviction rested not on the admittedly unchanged physical evidence, but on the experts' interpretation of that evidence. **The new interpretation**—that Alicia's death was attributable to pneumonia and not shaking—was unknown to Miller's counsel, the trial court found, and **not potentially available given the state of medical knowledge at the time**. *Id* at 4 [emphasis added].

\*\*\*\*

The trial court found that a reasonably diligent defense attorney could not have produced the expert testimony on which Miller now relies because at the time of her trial, **an overwhelming medical consensus deemed the presence of the diagnostic triad as conclusive evidence of child abuse**. The evidence amply supports the trial court's conclusion. *Id* at 4-5 [emphasis added].

\*\*\*\*

Counsel's recollection harmonizes with Dr. Ophoven's explanation of why Alicia's deadly pneumonia qualifies as newly discovered evidence. **"[S]tarting in the early 80's**," Dr. Ophoven recounted, "**it became routine** that if a child presented to medical attention with significant brain damage and there was the presence of subdural blood, retinal hemorrhages, and brain swelling - -those three things," **it was "routine" and "automatic" that the child would be diagnosed as a victim of SBS/AHT**. "And no other real aggressive or assertive exploration for an alternative explanation was undertaken," she added. In 2003, Dr. Ophoven asserted, SBS "was at its peak in terms of how often it was used to diagnose these cases." *Id* at 6-7 [emphasis added].

Plaintiff's position in the appellate proceedings is clear. She argued that no one could have known about this new approach to child abuse and head injuries. This was the very reason that she was successful. She should not now be allowed to argue that Dr. Hunter deliberately ignored knowledge which would have exonerated her, when she successfully argued that such information would not be to her attorney and, in fact, would not be available to anyone for another 15 to 20 years. Plaintiff prevailed on the argument that Dr. Hunter made a mistake. Under the law, she should stand by that position.

22

**8.   Testimony Given During a Court Proceeding is Subject to Absolute Immunity.**

Earlier in this brief was a statement that Plaintiff's complaint contains allegations about testimony by Dr. Hunter given at trial. Those allegations are found in paragraphs 42-45. They do not require detailed review, as the case law is clear on the fact that absolute immunity applies to testimony given in open court.

In *Briscoe v Lahue*, 460 U.S. 325; 103 S. Ct. 1108; 75 L. Ed. 2d 96 (1983) the Court recognized that, at common law, all witnesses were entitled to absolute immunity for any testimony provided in a court proceeding. Some suggested that the adoption of 42 U.S.C. 1983 abrogated that immunity in civil rights actions. The Court addressed this position:

> In short, the common law provided absolute immunity from subsequent damages liability for all persons -- governmental or otherwise -- who were integral parts of the judicial process. It is equally clear that *§ 1983* does not authorize a damages claim against private witnesses on the one hand, or against judges or prosecutors in the performance of their respective duties on the other.  *Id* at 334-335.

> The Sixth Circuit has held likewise. In *Gregory v City of Louisville, supra*  at 444

F.3d 738 the Court explained that:

> absolute immunity protects an official from liability even when the official acted with knowledge of the constitutional violation. *Id.* Testimony at adversarial judicial proceedings is the most historically grounded of these functions which merit absolute immunity. *See id*. *Id* at 738.

In *Moldowan, supra* at 578 F.3d 390 (citation omitted) the Court explained that witnesses are immune from suit "no matter how egregious or perjurious that testimony was alleged to have been." The doctrine of witness immunity also protects conspiracies to render false testimony; therefore, a plaintiff may not circumvent  absolute immunity by alleging that multiple defendants conspired to commit perjury. *Macko v. Byron*, 760 F.2d 95, 97 (6th Cir. 1985) (*per curiam*).

9.  **Count I, Due Process, Fails to State a Viable 1983 Claim.**

We are nearing the end of this brief. All that is left is to review the four counts in the complaint which allege fault on his part. Count I alleges a violation of due process rights. As developed under section 4 of this brief, such claims are subject to a three-year statute of limitations for personal injury claims. Those claims accrued when Plaintiff was convicted more than 20 years ago, and the limitations period has long expired. If, for some reason, Plaintiff argued for later accrual, she could go no further than January 2021 when her conviction was overturned. The statute of limitations would still have expired in January 2024. The complaint filed in March 2024 was untimely.

Plaintiff's claim is also barred by judicial estoppel. As developed under section 7 of this brief, Plaintiff successfully appealed her criminal conviction by arguing that Dr. Hunter followed mainstream thinking and did what any other forensic pathologist would have done. She cannot now argue that he fabricated the autopsy and conspired with others to have her convicted, particularly when she has pled absolutely no specific act or event which would demonstrate this conspiracy.

Finally, as the real essence of Plaintiff's claim is that Dr. Hunter made a mistake, her claims sound in negligence and qualified immunity applies. Plaintiff has not pled any specific act which would demonstrate intentional or reckless conduct and, in fact, has made several factual allegations which assert that Dr. Hunter misunderstood the medicine. Although there are conclusions regarding his intent, there are no factual allegations which would support any claim other than that his understanding of medicine had turned out to be mistaken. Qualified immunity bars such a claim.

**10. <u>Count II, Malicious Prosecution, Fails to State a Viable Claim.</u>**

Plaintiff's count II alleges malicious prosecution. There are three problems with this claim. First, it is untimely. It is uncontestable that Plaintiff's conviction was overturned in January 2021 and the three-year limitations period ran on January 2024. Plaintiff did not file the complaint until March 2024.

The malicious prosecution claim is also barred by judicial estoppel. There is no need to repeat the analysis. Suffice it to say that Plaintiff prevailed by arguing that Dr. Hunter was negligent for following mainstream thinking, and she now labels the same actions as an intentional wrong. She should not be allowed to play fast and loose with the courts in this fashion.

Finally, the factual allegations in the complaint do not support a malicious prosecution claim as they suggest, at worst, a mistake in interpreting the medical evidence. Malicious prosecution requires something more. In *Caminata v. County of Wexford*, 664 Fed.Appx. 496, 500 (6th Cir. 2016) the Court explained the elements:

> Similarly, to succeed on a Fourth Amendment malicious prosecution claim, a plaintiff must prove that the defendant made " 'deliberate or reckless falsehoods,' and 'mere negligence' will not create liability."

Plaintiff has alleged mere negligence, and her malicious prosecution claim must fail.

**11. <u>Count III, Conspiracy to Deprive Constitutional Rights, Fails to State a Viable Claim.</u>**

Count III alleges a conspiracy to deprive Plaintiff of her constitutional rights. This claim, like the others, is untimely. It was filed more than 20 years after a conspiracy claim would have accrued, and more than three years after Plaintiff's conviction was overturned. This claim is untimely.

There is another problem with the conspiracy claim. Plaintiff has not pled facts which

25

would support such a claim. A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." See *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff. *Hensley, supra* at 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). A plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Bell Atl. Corp. v. Twombly, supra* at 550 U.S. 565 (allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one). See also *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Plaintiff can point to absolutely nothing in this case which would provide legitimate support for a conspiracy claim. There is no proof of any common goal, any shared understanding, or any collusion of any kind. The minimal facts pled are neither direct nor circumstantial evidence of a conspiracy. There is not a single fact asserted in the complaint that could lead anyone but the most jaundiced sceptic to look at this situation and conclude that Dr. Hunter conspired to frame her by doing what any other forensic pathologist in his situation would have done at the time. Someone who believes that Dr. Hunter was involved in a conspiracy may very well also believe that there was a second shooter in Dallas and Elvis is still alive and well.

12. **Count IV, Failure to Intervene, Fails to State a Viable Claim.**

Count IV asserts that Dr. Hunter failed to intervene to protect her from harm. This claim, like all of the others, is subject to a three-year statute of limitations. As the claim accrued when Plaintiff was convicted, the statute of limitations expired a couple of decades ago. To the extent that Plaintiff disagrees, she still can't get around the fact that her conviction was overturned more than three years before she filed suit. This claim is untimely.

The second problem with this claim is that the factual allegations don't seem to satisfy the elements of the claim. The elements of the failure to intervene claim are "(1) the defendant observed or had reason to know that the constitutional violation was occurring, and (2) had both the opportunity and the means to prevent the harm from occurring. See *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir.1997). The *Turner* standard is regularly applied. In *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir.2008) the Court wrote:

> This court has held, however, that a police officer who fails to act to prevent the use of excessive force may still be held liable where "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir.1997).

More recently, the Court wrote that an officer must have "both (1) 'observed or had reason to know that excessive force would be or was being used, and (2) ... had both the opportunity and the means to prevent the harm from occurring.'" *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014).

While there are a host of opinions involving excessive force claims, the case law appears to be lacking in claims of failure to intervene in other contexts. More specifically,

27

it does not appear that failure to intervene can serve as a viable claim against someone who was examining evidence or investigating a claim. This observation could lead to a debate about whether a failure to intervene claim could ever be brought against a pathologist who performed an autopsy. However, that debate need not be reached in this this case, as discussed in the following paragraph.

Plaintiff alleges that Dr. Hunter deliberately and actively participated in a conspiracy to violate her constitutional rights. Dr. Hunter is one of four individuals named in Plaintiff's complaint who are said to have acted affirmatively to harm her. This defeats any failure to intervene claim. There is no logical basis to allege a failure to intervene against a person who is accused of being an active participant in the wrongdoing which required intervention. Plaintiff is effectively saying that the primary antagonist in a conflict should be sanctioned for not stepping in to stop him or herself from continuing with his or her own behavior. In simpler parlance, Plaintiff would have this Court punish the bad guy for not stopping the bad guy. Plaintiff would charge Dr. Hunter for his active participation, and then add another charge for letting himself do it. There is simply no viable argument as to failure to intervene.

## CONCLUSION

The basis for the present motion has been addressed in detail above, and that analysis will not be repeated. Defendant Dr. Hunter respectfully submits that all of the claims against him are flawed in multiple respects. The complaint, on its face, fails to ever state a viable claim upon which relief can be granted, and Dr. Hunter should be dismissed from this action.

28

Respectfully Submitted,
**WYNGAARDEN LAW, P.C.**

By    /s/ Michael L. Van Erp
       Robert M. Wyngaarden (P35604)
       Michael L. Van Erp (P44218)
       Wyngaarden Law, P.C.
       Attorney for Defendant
       Brian Hunter
       3445 Woods Edge Drive
       Okemos, Michigan 48864
Date: September 10, 2024     (517)349-3200